# United States Court of Appeals

## For the First Circuit

No. 04-2070

HAROLD J. MATURI; HENRY G. MATURI,

Plaintiffs, Appellants,

v.

MCLAUGHLIN RESEARCH CORP.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, U.S. District Judge]

Before

Howard, Circuit Judge,
Cyr, Senior Circuit Judge,
and Stahl, Senior Circuit Judge.

Joseph D. Whelan, with whom Kathleen A. Collins, and Hinckley, Allen & Snyder, were on brief, for appellants.
Mary Jo Johnson, with whom James S. Goldman, and Wilmer Cutler Pickering Hale and Dorr LLP, were on brief, for appellee.

July 1, 2005

**STAHL**, <u>**Senior Circuit Judge**</u>.  On September 10, 1998, Andra Kelly ("Andra"), the chairman of the board of Appellee McLaughlin Research Corporation ("MRC"), fired Appellants Harold J. Maturi ("Harold") and Henry G. Maturi ("Henry"), who had been MRC's president and vice-president, respectively, since 1991. Thereafter, Harold and Henry (collectively, "Appellants") filed this action against MRC in the United States District Court for the District of Rhode Island.  In their complaint, Appellants asserted a claim under the whistle-blower provision of the False Claims Act ("FCA"), 31 U.S.C. § 3730(h), as well as a claim under the Rhode Island Whistle-Blowers' Protection Act ("RIWPA"), R.I. Gen. Laws § 28-50-1 <u>et seq.</u>  The FCA and RIWPA claims were premised on Appellants' belief that they were wrongfully fired for, among other things, complaining about the allegedly fraudulent receipt of dual salaries and benefits by Conn Kelly ("Conn"), Andra's son and the director of marketing of MRC.  Following the close of discovery, MRC filed a motion for summary judgment, which the district court allowed.  Appellants now seek review of the dismissal of their claims as they relate to Conn's allegedly fraudulent receipt of dual salaries and benefits.  We affirm.

## I.  Background

We recount the facts in the light most favorable to Appellants, the individuals opposing summary judgment.  <u>See</u> <u>McAdams</u> v. <u>Mass. Mut. Life Ins. Co.</u>, 391 F.3d 287, 290 (1st Cir. 2004).

-2-

A.          MRC and Related Businesses

MRC is a contractor that provides engineering services to the government of the United States. At all relevant times, MRC's principal shareholders were members of the McLaughlin family: Andra, the daughter of MRC's founder; Bruce and Douglas McLaughlin, Andra's brothers; and Brandy McLaughlin-Wall, Andra's niece. Andra's son, Conn, and another niece, Morgan McLaughlin, also held shares in MRC, although they held far fewer shares than the aforementioned family members.[1]

Prior to Appellants' termination, the above individuals, with the exception of Conn[2] and the addition of Harold, comprised MRC's board of directors (the "board").[3] Andra was chairman of the board; Harold, in addition to being a board member, was MRC's president and chief operating officer[4]; and Henry was the company's

---

[1]It appears that Conn owns less than one percent of MRC's stock.

[2]It is not clear whether Bruce McLaughlin was a member of the board, but the issue has no relevance to this appeal.

[3]Appellants, in their opening brief to this court, assert that Conn was a member of MRC's board, but they do not include a citation to the record to support their assertion. The record indicates that Conn was the board's secretary and that he attended board meetings only to take notes; it does not indicate that he was a board member.

[4]There is a dispute as to whether Harold was also MRC's chief executive officer ("CEO"); Appellants claim that Andra, not Harold, held this position. Nevertheless, this dispute is not material, because, regardless of whether Harold was officially designated as MRC's CEO, it is clear from the record that he was responsible for the daily management of the company.

executive vice-president.  Henry reported to Harold, and Harold reported directly to Andra.

Besides MRC, the McLaughlin family owned and operated several other businesses.  One of those businesses was McLaughlin Partners ("Partners"), a company created to provide services (for a fee) to the other McLaughlin businesses, including MRC.

As a government contractor, MRC had to follow a set procedure in order to receive payment from the government.  Before the beginning of each fiscal year, MRC had to submit a provisional budget to the government.  The budget, which was based largely on a projection of MRC's yearly expenses, would list the payments that MRC was to receive from the government during the year.  MRC could adjust the budget at any time over the course of the year if its actual expenses differed from its projections.  At the end of the year, a final accounting would determine whether the government owed MRC money or vice versa.

From 1991 to 1998, MRC's annual revenue fell from approximately $30 million to $12 million.[5]  As a result, MRC reduced its workforce by more than half.  Moreover, in 1998, Appellants' salaries were reduced by ten percent,[6] and they were

_____

[5]Appellants contend that the decline in revenue was the result of a reduction in government spending and not their management. Further, Appellants point out that, despite the decline in revenue, MRC remained profitable.

[6]It appears that Andra's salary was also cut by ten percent. In any event, Henry viewed the reduction in salary as an adverse

-4-

not awarded performance-related bonuses for the first time since 1991. In his deposition, Harold testified that by 1998, "there was an undertone of anxiety amongst all [MRC] employees, including myself, . . . about the possibility of being laid off."[7]

B.        Harold and Henry's Responsibilities

As president, Harold was responsible for the "day-to-day" management, including the financial management, of MRC. Harold had ultimate responsibility over the budget and its adjustment over the course of a given year. In other words, Harold had authority over government billings and payments. In adjusting the budget, Harold could make any expense unallowable, meaning that it would not be charged to the government. When Harold had a question about whether an expense could be charged to the government, he sought the advice of a government auditor from the Defense Contract Auditing Agency ("DCAA").

Harold was also responsible for reporting "items of concern" to Andra and the board. He "fulfilled that responsibility . . . by [regularly] sending memos to Andra." Over the years, when Harold discovered what he thought might be a fraudulent practice or a wrongful charge to the government, he reported it to Andra in a memo.

_____

action against him.

    [7]Unless it is otherwise indicated, all quotations that appear in this section were taken from Harold's deposition testimony.

Although Harold was ultimately responsible for the budget, it was Henry who prepared the budget; Henry would submit a draft budget to Harold for approval. Henry, like Harold, had the authority to revise the budget during a given year and make any expense unallowable. Henry felt that he had a duty to report any problems he encountered to Harold, who would then report them to Andra and the board. Indeed, in his deposition, Henry testified: "[I]f somebody [in] the [McLaughlin] family were conducting fraud . . . [, m]y responsibility would be to discuss it with [Harold], . . . [and h]e would have to take it from . . . there."

C.      Events Pertaining to the Litigation

In June 1998, MRC hired Conn as its director of marketing.[8] Before starting at MRC, Conn worked for Partners. A short time after Conn's arrival at MRC, Harold and Henry learned that he had been collecting a salary and benefits from both MRC and Partners.[9] Appellants then met with Conn on more than one occasion

---

[8]Andra informed Harold that Conn was to be employed at MRC, but it was Harold who assigned Conn to the position of director of marketing. When Conn was hired, he had no business training or experience.

[9]The parties agree that Conn received dual salaries and benefits and that Conn's Partners' salary and benefits were charged to the government. But, MRC insists that Conn's MRC salary and benefits were not charged to the government at any point during 1998 or in the final, end-of-the-year accounting and, thus, that his receipt of dual salaries and benefits could not have resulted in a fraud on the government. For purposes of this opinion, we assume that Conn's receipt of dual salaries and benefits was fraudulent.

to discuss the issue. During one meeting, Harold informed Conn that his actions were "fraudulent" and that he could be sent to prison. Conn told Harold that the issue was "[n]one of [his] business." Harold then threatened to discuss the issue with DCAA auditors. In response, Conn allegedly said: "'If you go to DCAA, I'll have you fired' or 'you'll be fired.'" Conn never mentioned the details of his conversations with Appellants to Andra.[10]

During this period, Andra hired James Waddell ("Waddell"), a management consultant and her son-in-law, to evaluate MRC's senior management--Harold and Henry. As part of his evaluation, Waddell interviewed a number of MRC's mid-level managers. Conn arranged for the interviews to occur while Appellants were on vacation. In August 1998, Waddell submitted to Andra a report that was critical of Appellants' management style.[11]

On August 24, 1998, Harold drafted a letter to Andra concerning the Conn issue. It stated, in relevant part:

> Recently it . . . has been brought to my
> attention . . . that Conn has been receiving

---

[10]According to the record, Conn told Andra that he had a heated discussion with Appellants but did not discuss the details of that discussion.

[11]Appellants insist that Waddell was not qualified for the task for which he was hired and that his interview notes did not support the conclusions he reached in the report. Regardless of whether Waddell was qualified to evaluate Appellants' management style, his interview notes certainly contain comments critical of Appellants. And, for purposes of this opinion, the information pertaining to Appellants that was communicated to Andra is significant; the veracity of that information is not.

two salaries. . . . In that we are subject to DCAA [a]udits there could be a potential problem should [DCAA auditors] uncover this . . . . In that I recognize that this could be a potential problem . . . , I am first bring[ing this] to your attention. I tried to discuss this with Conn . . . , but he . . . wouldn't recognize the problem. I am looking to you . . . to help me resolve this situation.

Andra did not respond to the letter. Neither Harold nor Henry took any further action with respect to the Conn issue while employed by MRC. And, they did not discuss the issue with the government until May 31, 2000, almost two years after they were fired and subsequent to the initiation of this litigation.

On September 10, 1998, Andra met with Harold. At the meeting, Andra allegedly said that she felt "threatened" by Harold's letter of August 24, 1998 and referred to it as "the last straw." She then terminated the employment of Harold and Henry.[12]

On December 17, 1999, Appellants initiated this action. In their complaint, Appellants asserted claims against MRC under the whistle-blower provisions of the FCA, 31 U.S.C. § 3730(h), and the RIWPA, R.I. Gen. Laws § 28-50-1 et seq. Appellants asserted that they were fired for, inter alia, complaining about Conn's receipt of dual salaries and benefits. Following the close of discovery, MRC filed a motion for summary judgment, which was

_____

[12]The day before, Andra and Waddell had a conversation over the telephone. Waddell's notes from the call state, "Letter re Conn is focal point." Although Appellants contend that Conn participated in the call, there is no support for this contention in the record.

allowed.  Appellants now appeal that ruling, but only as it relates to Conn's receipt of dual salaries and benefits.

## II.  Discussion

We review the grant of a motion for summary judgment <u>de novo</u>.  <u>GTE Wireless, Inc.</u> v. <u>Cellexis Int'l, Inc.</u>, 341 F.3d 1, 4 (1st Cir. 2003).  Summary judgment is appropriate only if the record reveals "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  We may affirm a grant of summary judgment on any ground supported by the record.  <u>See</u> <u>Geffon</u> v. <u>Micrion Corp.</u>, 249 F.3d 29, 35 (1st Cir. 2001).

A.        <u>False Claims Act Claim</u>

The FCA prohibits the knowing submission of false or fraudulent claims[13] to the federal government.  31 U.S.C. § 3729(a); <u>see</u> <u>United States ex rel. Karvelas</u> v. <u>Melrose-Wakefield Hosp.</u>, 360 F.3d 220, 224-25 (1st Cir. 2004).  The statute's "'qui tam' provisions[, <u>see</u> 31 U.S.C. § 3730,] authorize[] private individuals to sue on behalf of the federal government and were intended to aid the government in discovering fraud and abuse by unleashing a posse of <u>ad hoc</u> deputies to uncover and prosecute frauds against the

_____

[13]A claim is defined as "any request or demand . . . for money or property which is made . . . if the United States Government provides [or will reimburse] any portion of the money or property which is requested or demanded."  31 U.S.C. § 3729(c).

government." Karvelas, 360 F.3d at 224 (internal quotation marks and footnote omitted).

To encourage the filing of qui tam actions and protect whistle-blowers--persons who expose false or fraudulent claims, the FCA imposes liability on employers who retaliate against employees who pursue, investigate, or contribute to an action exposing fraud against the government. See 31 U.S.C. § 3730(h). The statute provides, in relevant part:

> Any employee who is discharged . . . or in any . . . manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

Id. Thus, to prevail on an FCA retaliation claim, a plaintiff must show that: he engaged in conduct protected under the FCA; the employer knew that he was engaged in such conduct[14]; and the employer discharged or discriminated against him because of his protected conduct.[15] Karvelas, 360 F.3d at 235. An employee's

_____

[14]"The requirement that employers have knowledge that an employee is engaged in 'protected conduct' ensures that § 3730(h) suits are only prosecuted where there has been actual retaliation." Hutchins v. Wilentz, Goldman & Spitzer, 253 F.3d 176, 186 n.7 (3d Cir. 2001).

[15]If the plaintiff satisfies his burden, "the burden shifts to the employer to prove that the employee would have been terminated or subjected to other adverse action even if he or she had not

-10-

conduct is protected where it involves "acts done . . . in furtherance of" an FCA action.  31 U.S.C. § 3730(h).

Appellants cannot satisfy the above standard, and as a result, their FCA claim was properly dismissed.  Even if we assume that Appellants were engaged in protected conduct in connection with the Conn issue, and we are skeptical that they were,[16] the record does not establish that their superior at MRC knew that they were engaged in such conduct.

Ordinarily, an employer is charged with knowledge that an employee is engaged in protected conduct when the employer is put on notice that the employee is taking action that reasonably could lead to an FCA case.  See Karvelas, 360 F.3d at 238.  But, a number of our sister circuits have held that where an employee oversees government billings or payments as a part of his regular job responsibilities, he must make it clear that his actions go beyond his regular duties to establish that his employer was on notice that he was engaged in protected conduct.  See Yuhasz v. Brush

engaged in the protected conduct."  Karvelas, 360 F.3d at 235.

[16]It does not appear that any of Appellants' actions in connection with the Conn issue were undertaken "in furtherance of" an FCA action.  31 U.S.C. § 3730(h).  Rather, it appears as though Appellants acted entirely in accordance with their employment duties when they investigated and pursued the Conn issue and that they sought to resolve the issue in-house and without any thought of initiating an FCA action.  See Hutchins, 253 F.3d at 191 ("[W]here an employee's job duties involve investigating and reporting fraud, the employee's burden of proving he engaged in 'protected conduct' . . . is heightened.").

Wellman, Inc., 341 F.3d 559, 567-68 (6th Cir. 2003); Hutchins, 253 F.3d at 191; Eberhardt v. Integrated Design & Constr., Inc., 167 F.3d 861, 868 (4th Cir. 1999); United States ex rel. Ramseyer v. Century Healthcare Corp., 90 F.3d 1514, 1523 (10th Cir. 1996); Robertson v. Bell Helicopter Textron, Inc., 32 F.3d 948, 951-52 (5th Cir. 1994). Placing a heightened burden on such employees ensures that employers will be disciplined for taking adverse action against their employees only when they are aware that the employees were engaged in protected conduct, that is, only when a nexus exists between the adverse employment action and the protected conduct. See Ramseyer, 90 F.3d at 1523 n.7 (Employees subject to the heightened burden "must make clear their intentions of bringing or assisting in an FCA action in order to overcome the presumption that they are merely acting in accordance with their employment obligations.").

We agree that where an employee's job responsibilities involve overseeing government billings or payments, his burden of proving that his employer was on notice that he was engaged in protected conduct should be heightened. Yet, such an employee can put his employer on notice by "any action which . . . [, regardless of his job duties,] would put the employer on notice that [FCA] litigation is a reasonable possibility." Eberhardt, 167 F.3d at 868.

Here, both Harold and Henry had authority over government billings and payments,[17] and consequently, they have to establish that, despite their job duties, Andra was on notice that FCA litigation was a reasonable possibility when she fired them. Neither Appellant can meet this heightened burden.

1.      Harold

Harold's August 24, 1998 letter to Andra was his only communication with his superior[18] about Conn's receipt of dual salaries and benefits. In the letter, Harold raised the Conn issue as a "potential problem" if discovered by DCAA auditors and asked Andra to help him "resolve th[e] situation." Harold did not accuse Andra or MRC of engaging in fraudulent behavior or express a desire to involve any other individual or entity in the Conn issue. See id. (stating that an employee whose job duties include overseeing government billings or payments can put his employer on notice by "characterizing the employer's conduct as illegal or fraudulent or recommending that legal counsel become involved"). Given the

_____

[17]Appellants may have delegated tasks associated with government billings and payments to other MRC employees, but that does not change the fact that they were still responsible for overseeing such billings and payments.

[18]Harold insists that Conn was also his superior. There is no question that Harold felt that he needed to give Conn and those at MRC related to Andra special consideration because of their relationship with Andra and that Conn, in particular, did not always act towards Harold in a way in which a typical subordinate would ordinarily act towards a superior. Still, the record does not support the view that Conn was Harold's superior.

-13-

content of the letter, the fact that Harold oversaw government billings, and that he had raised similar issues in letters to Andra in the past, the letter could not reasonably have put Andra on notice that FCA litigation was a realistic possibility.[19]

Moreover, despite Harold's insistence to the contrary, it is of no consequence that Harold told Conn that Conn's actions were fraudulent; Harold told Conn that he intended to discuss Conn's receipt of dual salaries and benefits with DCAA auditors; and Conn told Harold that he would be fired if he did so. First, the record shows that Conn was subordinate to Harold; Conn was not Harold's superior. Second, it was Andra, and not Conn, who fired Harold. And, third, Conn never mentioned the details of his confrontations with Harold to Andra. Harold's interactions with Conn could not

_____

[19]Appellants claim that immediately before their firing, Andra referred to the letter as a "threat" and "the last straw." But, it would not be reasonable (indeed, it would be overly speculative) to interpret these statements (even assuming they were made in the first place) as proof that Andra viewed the letter as a precursor to FCA litigation. Given the content of the letter, it is reasonable to assume that Andra characterized it as a threat because it could have jeopardized her control over MRC--it could have led MRC's other board members to question her decision to hire Conn and, quite possibly, her overall leadership of the company, particularly in light of the fact that MRC's revenues had been on the decline. And, Andra's "last straw" comment does not appear particularly retaliatory when one considers that she viewed the letter as raising a non-issue; a report had recently been compiled that was critical of Appellants' management style; a short time before, Appellants' salaries had been reduced and they had not been awarded performance-related bonuses; and MRC's revenues (and workforce) had been declining for a number of years.

have put Andra, his superior, on notice that FCA litigation was a distinct possibility.[20]

2.      Henry

Turning now to Henry, there is nothing in the record indicating that Andra was or should have been on notice of Henry's actions in connection with the Conn issue.  Henry never discussed with Andra his concerns with respect to Conn.[21]  In fact, at his deposition, Henry stated that he would report problems that he encountered to Harold and that Harold would "take it from . . . there."  And, there was nothing in Harold's sole communication to Andra about the Conn issue that would have put Andra on notice that there was a realistic possibility of FCA litigation, much less FCA litigation initiated by Henry.

B.      Rhode Island Whistle-Blowers' Protection Act Claim

Having determined that the district court did not err in dismissing Appellants' federal whistle-blower claim, we now address whether it erred in dismissing their state law claim.  In order to

---

[20]We note that, given the factual circumstances of this case, a threat of disclosing the Conn issue to DCAA auditors, even if communicated to Andra, would not have been sufficient to satisfy the notice obligation.  Whenever Harold was unsure of whether an expense could be properly charged to the government, he consulted DCAA auditors.  Thus, threatening to disclose the Conn issue to DCAA auditors is not akin to threatening, for example, to disclose the issue to the Federal Bureau of Investigation or file a whistle-blower action.

[21]Moreover, there is nothing in the record to suggest that Conn communicated Henry's concerns to Andra.

recover under the RIWPA, a plaintiff must "show by clear and convincing evidence that he . . . or a person acting on his . . . behalf was about to report to a public body . . . a violation, which the employee knew or reasonably believed had occurred or was about to occur, of a [state or federal] law." R.I. Gen. Laws § 28-50-4(d). Appellants' state law claim must fail, because neither Harold nor Henry was "about to report" Conn's receipt of dual salaries and benefits to "a public body." Id. Henry was content to let Harold handle the Conn issue, and in the letter of August 24, 1998, Harold made it clear that he hoped that he and Andra would be able to handle the issue in-house.[22] We note that the fact that Appellants did not report the issue to the government until May 31, 2000, almost two years after their firing, goes against any argument that they were "about to report" it to the government in September 1998.

**Affirmed.**

_____

[22]Although the DCAA arguably constitutes "a public body" under R.I. Gen. Laws § 28-50-2(4) ("'Public body' means . . . (vii) [a]ny federal agency."), and Harold told Conn that he intended to discuss Conn's receipt of dual salaries and benefits with DCAA auditors, Harold's subsequent letter establishes that he was not "about to report" the Conn issue to the DCAA. Therefore, we need not address whether, under the facts of this case, the DCAA constitutes "a public body." Cf. supra note 20.