# United States Court of Appeals
## For the First Circuit

No. 09-1665

LUIS R. COLLAZO et al.,

Plaintiffs, Appellants,

v.

BRISTOL-MYERS SQUIBB MANUFACTURING, INC.,

Defendant, Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Torruella, Selya and Lipez,
Circuit Judges.

José G. Fagot Díaz, with whom Fagot Law Office, Víctor J. Casal Vázquez, and Casal Law Office were on brief, for appellants.
Carl Schuster, with whom Shiara L. Diloné-Fernández and Schuster Aquiló LLP were on brief, for appellee.

August 5, 2010

**LIPEZ, Circuit Judge**. Luis R. Collazo, Vilma Vargas and their conjugal partnership brought this action against Collazo's former employer, Bristol-Myers Squibb Manufacturing, Inc. (Bristol-Myers), alleging violations of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e-3, and Puerto Rico law. Collazo alleged that Bristol-Myers terminated him (1) in retaliation for attempting to offer technical documentation and data to the Food and Drug Administration (FDA) in violation of Puerto Rico Act 115, P.R. Laws Ann. tit 29, §§ 194-194b, and (2) in retaliation for his opposition to the sexual harassment of another Bristol-Myers employee, in violation of Title VII and Puerto Rico law. The district court granted summary judgment to Bristol-Myers on all claims.

Our analysis of Collazo's Title VII claim requires us to apply the Supreme Court's recent decision in Crawford v. Metropolitan Government of Nashville & Davidson County, Tenn., 129 S. Ct 846 (2009), which addressed the scope of conduct protected by the opposition clause of Title VII's antiretaliation provision. Applying Crawford, we conclude that Collazo's repeated efforts to assist a fellow employee in filing and pursuing her sexual harassment complaint with the company's Human Resources Department (Human Resources) qualify as protected opposition to the complained-of harassment. We also conclude that Collazo has established genuine issues of material fact on the other elements of his Title VII retaliation claim.

-2-

Therefore, we vacate the judgment insofar as it granted summary judgment on Collazo's Title VII and related state law claims and remand those claims for further proceedings. However, we affirm the judgment insofar as it dismissed Collazo's Act 115 claim.

## I.

We recount the facts in the light most favorable to Collazo, the nonmoving party. Agusty-Reyes v. Dep't of Educ. of P.R., 601 F.3d 45, 48 (1st Cir. 2010).

In 1995, Collazo was hired by Bristol-Myers, a pharmaceutical manufacturer, as a scientist at its plant in Barceloneta, Puerto Rico. Several years later, he assumed a management-level position, Senior Process Scientist I. His responsibilities included supervising a group of laboratory scientists, supporting the plant's manufacturing processes, trouble-shooting, and issuing recommendations and reports. Collazo was stationed at the Barceloneta plant for most of his time with Bristol-Myers, although for several years around 1998-2000 he worked at its plant in Humacao, Puerto Rico. Beginning in April 2002, Collazo's immediate supervisor was Carlos López, the Director of Technical Services for Bristol-Myers' plants in both Barceloneta and Humacao.

## A. Requests for Technical Documents

Sometime prior to 2003, Bristol-Myers' Barceloneta plant was identified as a possible back-up site for the production of Atazanavir, an HIV treatment. Before the site could obtain federal approval to begin production, it had to undergo preapproval inspection by the FDA. In January 2003, Ramon Corcino, Director of Quality Assurance and Quality Control for the Barceloneta site, sent an email to Collazo and several other employees about an upcoming FDA preapproval inspection in preparation for Atazanavir production. The email stated:

> Team,
> Unless someone objects, I will advise we are ready. We did the readiness exercise last year and just have to make sure that what we did recently regarding the re-validation of the ultimate synthesis step is in order. Of course, this include[s] facilities that need to be clean and in good state of repair.

Collazo was concerned that there were deficiencies in the documentation of certain laboratory procedures and results related to Atanazavir production. In response to Corcino's email, he made efforts to obtain and review this documentation in preparation for the preapproval inspection. On February 5, Collazo sent an email to Eric Acevedo and Marisol Cordero, two Bristol-Myers scientists who had been assigned to perform laboratory tests and other technical duties related to the production of Atazanavir. Collazo's email stated:

The FDA has requested a visit to our facilities regarding the approval of Atazanavir. In order to be ready for this visit, I am requesting the transfer at least of a copy of all the technical documents regarding this process. And I also requesting all the information and documentation (such as lab notebook) regarding use test and vendor qualification. This needs to be accompanied with all the raw data supporting does [sic] experiment. All these information needs to be review and evaluated in conjunction with QA in order to prepare for this important visit. These requested information can be provided to me at your earliest convenience.

I would like to thank you in advance for your support.

On February 14, Collazo sent a follow-up email to López, who had been copied on the earlier message, stating that he had "not received any proper response" from Acevedo or Cordero and that it was "very important that this information is evaluated and strategically studied well prior [to] any visit from the FDA for a PAI [preapproval inspection], in order to be ready." He asked López for assistance in obtaining the requested information. Sometime later, Collazo spoke directly with Cordero, who told him that she had spoken to López and would deliver the requested data to him the following Monday, February 23. Collazo never received this information, as he was terminated on February 21.

The FDA conducted its preapproval inspection of the Barceloneta plant in May 2003. Collazo admitted in deposition that the FDA did not request any specific documents or data in advance of the preapproval inspection and that he did not know whether the

FDA ever requested the information he had sought from Acevedo and Cordero.

**B. Complaints of Sexual Harassment**

On February 10, 2003, Diana Hiraldo, one of the scientists under Collazo's supervision, approached him and told him that she felt sexually harassed by Acevedo, another scientist in her group. Hiraldo explained that Acevedo was making "comments against her person," following her, asking other employees what she was doing, and frequently calling her to ask what she was working on. She said that her husband felt very uncomfortable with the situation. Hiraldo further complained that she had overheard Acevedo criticizing her professional work, stating to other employees that she did not deserve certain work accolades. Upon hearing Hiraldo's complaints, Collazo recalled noticing that Acevedo called Hiraldo on a regular basis to check what she was doing, "stare[d] at her all the time," "undress[ed] her with his eyes," and looked at her with "elevator eyes." Collazo also recalled an incident in which Acevedo commented, in Hiraldo's presence, that his "wife was not giving him anything to eat." Collazo understood this comment to have sexual overtones and later told Acevedo to "be careful" with comments like that in front of female employees.

Collazo spoke to Acevedo individually about Hiraldo's complaints of sexual harassment. Acevedo apologized for criticizing her work performance, but stated that he preferred to speak with his

immediate supervisor about Hiraldo's other allegations. At Hiraldo's request, Collazo then arranged a meeting with Edgardo García, a Human Resources Specialist, and accompanied Hiraldo to the meeting. Hiraldo explained her concerns to García and received information on how to initiate a grievance. After Hiraldo left, Collazo noted to García that this was a "serious case, a serious case where this girl alleges that she is being sexually harassed by this guy." At García's suggestion, Collazo then emailed López to inform him of Hiraldo's complaint and the steps taken to address it.[1]

Two days later, on February 12, Hiraldo approached Collazo to express concern that Human Resources had not yet taken action on her sexual harassment complaint. Collazo again accompanied her to meet with García, and Hiraldo explained the basis for her complaint in more detail. On February 20, Hiraldo came to Collazo to request another meeting with García. Collazo could not find García, but left him a voicemail message stating that he needed to speak with García about Hiraldo's sexual harassment case.

---

[1] Collazo's email stated that, according to Hiraldo, Acevedo had "created uncomfortable situation around her peers (mainly non-productive comments)" and that Collazo had personally witnessed "these types of comments." Collazo further explained that he had spoken to Acevedo and explained that "it was not good for the image of team work that we are projecting."

## C. Termination

On February 21, in response to a voicemail message, Collazo reported to Human Resources. López and Human Resources Director Viviana Vilanova met briefly with Collazo, and López informed him that he was being terminated because of communication and performance issues and a company reorganization. Shocked, Collazo did not ask for a further explanation of the reasons for his termination. The factual bases for these proffered reasons, which the parties hotly dispute, are discussed in more detail below.

## D. Proceedings in the District Court

Collazo filed this action against Bristol-Myers in February 2004. In his first amended complaint, he claimed, inter alia, that he was terminated (1) in retaliation for attempting to provide the FDA with information related to Atazanavir in violation of Act 115 and (2) in retaliation for opposing Acevedo's sexual harassment of Hiraldo, in violation of Title VII and Puerto Rico law.

In August 2005, Bristol-Myers moved for summary judgment on all claims, arguing that Collazo had not engaged in any protected conduct and there was no causal connection between his conduct and his termination. After several delays, Collazo filed his opposition to summary judgment in July 2006. In March 2009, the court granted Bristol-Myers' summary judgment motion "for the reasons stated by defendant Bristol-Myers" in its briefing. This appeal followed.

-8-

We review the district court's grant of summary judgment de novo, viewing the record in the light most favorable to the nonmoving party. Aqusty-Reyes, 601 F.3d at 52. We affirm only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Id.

**A. Act 115**

Collazo contends that the district court erred by granting summary judgment on his Act 115 claim. Act 115 prohibits employers from discharging or otherwise discriminating against employees because they "offer or attempt to offer, verbally or in writing, any testimony, expression or information before a legislative, administrative or judicial forum in Puerto Rico." P.R. Laws Ann. tit. 29, § 194a(a) (1991). The statute requires the employee to establish, by direct or circumstantial evidence, a prima facie case that he or she (1) "participated in an activity protected by §§ 194 et seq." and (2) was subsequently discharged or otherwise discriminated against. Id. § 194a(c); see Lupu v. Wyndham El Conquistador Resort & Golden Door Spa, 524 F.3d 312, 313 (1st Cir. 2008).

The undisputed facts demonstrate that Collazo did not engage in protected activity under Act 115 -- that is, he did not "offer or attempt to offer" any information "before a legislative, administrative or judicial forum in Puerto Rico." P.R. Laws Ann.

tit. 29, § 194a(a). Collazo admitted in deposition that he never presented any information related to Atanazavir to the FDA, either orally or in writing, nor did he inform anyone at Bristol-Myers that he would report such information to the FDA. Instead, in advance of the FDA's preapproval inspection, Collazo requested technical documents related to Atanazavir production from two co-workers involved in testing the product, Acevedo and Cordero, and later sought assistance from López in securing these documents. Collazo's emails stated that the requested information needed to be reviewed and evaluated "in order to prepare for [the FDA's] important visit" and that it was "very important that this information is evaluated and strategically studied well prior [to] any visit from the FDA for a PAI [preapproval inspection], in order to be ready." The FDA did not request these or other specific documents in advance of its inspection, and Collazo admitted that he did not know whether the FDA ever requested these documents.

Collazo's internal request for technical documents in preparation for the upcoming FDA preapproval inspection, without more, does not amount to offering or attempting to offer information to a governmental authority within the meaning of § 194a(a). See Lupu, 524 F.3d at 313 (holding that employee did not offer or attempt to offer testimony under § 194a(a) where he discussed concerns with supervisor about hotel's possible noncompliance with government regulations and unintentionally left document on

-10-

supervisor's desk listing questions to ask attorney about his rights if he went to government authorities, but employee did not report or threaten to report the perceived irregularities to authorities). Collazo contends that he "requested the documentation involving Atazanavir in light of the FDA visit, thus he 'intended to offer' this information to the FDA." However, Collazo offers no authority for the proposition that merely _intending_ to offer information to a governmental authority is equivalent to "offer[ing] or attempt[ing] to offer" this information under § 194a(a). In the absence of such authority, we decline to adopt such an expansive view of the statute.[2]

## B. Retaliation for Opposition to Sexual Harassment

Collazo next contends that the district court erred in granting summary judgment on his claim that he was terminated for opposing sexual harassment in the workplace, in violation of Title VII and analogous provisions of Puerto Rico law.[3]

---

[2] Collazo relies on several cases for which English translations are not available in the bound volumes of the court's reporter, and he has not provided a translation as required by our rules. See 1st Cir. R. 30(e). Collazo cannot use these cases to support his argument. See Lupu, 524 F.3d at 314 n.3.

[3] Collazo relies on the antiretaliation provisions of two Commonwealth statutes addressing unlawful employment practices, Puerto Rico Acts 17 and 69. See Act 17, P.R. Laws Ann. tit. 29, § 155h; Act 69, P.R. Laws Ann. tit. 29, § 1340. Bristol-Myers concedes that the same analysis applies to Collazo's retaliation claims under Title VII and Acts 17 and 69, and therefore we do not separately analyze Collazo's claims under the Puerto Rico statutes.

Title VII, 42 U.S.C. § 2000e-3(a), provides that

> [i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII].

To make out a prima facie case of retaliation under the familiar burden-shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 801-03 (1973), the plaintiff must prove that (1) he or she engaged in protected activity under Title VII, (2) he or she suffered an adverse employment action, and (3) the adverse employment action was causally connected to the protected activity. Fantini v. Salem State College, 557 F.3d 22, 32 (1st Cir. 2009).

Once the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for its employment decision. Roman v. Potter, 604 F.3d 34, 39 (1st Cir. 2010). If the defendant meets its burden of production, "the burden shifts back to [the plaintiff] to show that the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus." Id. (internal quotation marks and citation omitted).

-12-

## 1. Prima Facie Case

Bristol-Myers argues that Collazo has not established a prima facie case of retaliation because (a) Collazo did not engage in protected activity and (b) there was no causal connection between Collazo's alleged protected conduct and his termination. We address each issue in turn.

### a. Protected Activity

Collazo relies primarily on the opposition clause of Title VII's antiretaliation provision, which makes it unlawful "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). The Supreme Court recently addressed the scope of the opposition clause in Crawford, 129 S. Ct 846. The Court held that the term "oppose," left undefined by the statute, carries its ordinary meaning, which includes "'to resist or antagonize . . .; to contend against; to confront; resist; withstand,'" or "'to be hostile or adverse to, as in opinion.'" Id. at 850 (quoting Webster's New International Dictionary 1710 (2d ed. 1958) and Random House Dictionary of English Language 1359 (2d ed. 1987)). Applying this standard, the Court held that a plaintiff who did not initiate a complaint about sexual harassment nevertheless engaged in protected conduct under the opposition clause. Id. at 849. In response to questions posed to her during an internal investigation, the plaintiff described various instances of sexually

-13-

harassing behavior by another employee.  The Court held that plaintiff's responses to employer questioning could reasonably be seen as resistant or antagonistic to the sexually harassing treatment, "if for no other reason than the point . . . explained by an EEOC guideline: 'When an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication' virtually always 'constitutes the employee's opposition to the activity.'"  Id. at 851 (quoting 2 EEOC Compliance Manual §§ 8-II-B(1),(2), p. 614:0003 (Mar. 2003)).  The Court rejected the Sixth Circuit's view that the opposition clause required an employee to engage in "active, consistent 'opposing' activities" and to instigate or initiate a complaint.  Id. at 851.

A reasonable jury could well find that Collazo "opposed" Acevedo's treatment of Hiraldo.  On February 10, after Hiraldo complained to Collazo that she felt sexually harassed by Acevedo, Collazo spoke to Acevedo individually about Hiraldo's sexual harassment complaints and elicited a limited apology.  On Hiraldo's request, Collazo then arranged a meeting with García in Human Resources and accompanied her to meet with García so that she could explain her concerns and receive information on how to initiate the grievance process.  Afterward, Collazo noted to García that this was a "serious case" of alleged sexual harassment and he apprised López of Hiraldo's complaints.  On February 12, after Hiraldo told him

-14-

that Human Resources had not yet acted on her complaint, Collazo accompanied Hiraldo to meet with García a second time.  On February 20, faced with continued inaction from Human Resources, Collazo requested a third meeting with García to discuss Hiraldo's case. This third meeting never occurred, however, because Collazo was terminated on February 21.  A jury could reasonably view Collazo's persistent efforts to help Hiraldo initiate her sexual harassment complaint and urge Human Resources to act upon that complaint as resistant or antagonistic to the complained-of conduct.

Relying on Crawford, Bristol-Myers argues that Collazo did not "oppose" any discriminatory conduct because he "did not utter words" during the meetings with García but instead "simply listened to Hiraldo."  However, in addition to accompanying Hiraldo to meet with García, Collazo discussed her complaints with García, López, and Acevedo himself.  Moreover, nothing in Crawford or Title VII's antiretaliation provision suggests that employees engage in protected conduct only when they verbally communicate their opposition to unlawful employment practices.  On the contrary, Crawford recognized that an employee can oppose unlawful employment practices by his or her conduct.  See Crawford, 129 S. Ct at 851 (noting that "we would call it 'opposition' if an employee took a stand against an employer's discriminatory practices not by 'instigating' action, but by standing pat, say, by refusing to follow a supervisor's order to fire a junior worker for

-15-

discriminatory reasons"). Justice Alito, in a concurring opinion, emphasized that in his view it was still an open question whether the opposition clause protects employees who do not communicate their views to their employers. Id. at 855 (Alito, J., concurring). However, Justice Alito did not suggest that employees must verbally express their views, but instead acknowledged that employees may communicate their views to their employers through "purposive conduct." Id. at 853, 855 (Alito, J., concurring). By repeatedly accompanying Hiraldo to Human Resources to file and pursue her sexual harassment complaint, Collazo effectively and purposefully communicated his opposition to Acevedo's treatment of Hiraldo.

Bristol-Myers further contends that even if Collazo "opposed" Acevedo's treatment of Hiraldo, Collazo did not engage in protected activity because the challenged conduct was not "made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). Bristol-Myers points to evidence that in the month after Collazo's termination, Human Resources Director Vilanova initiated an internal investigation into Hiraldo's sexual harassment claim, conducting interviews with Hiraldo, Acevedo, and two of Hiraldo's fellow employees.[4] Bristol-Myers emphasizes that "[i]mportantly,

---

[4] Bristol-Myers also points out that Hiraldo wrote an email to Vilanova as part of the internal investigation in which Hiraldo complained of "harassment" but did not expressly use the term "sexual harassment," and Vilanova testified in her deposition that Hiraldo had complained of "harassment," not "sexual harassment." However, Vilanova acknowledged in her deposition that her handwritten notes of her interview with Hiraldo were titled "Sexual

-16-

based on her investigation, Vilanova concluded that Acevedo had not engaged in conduct amounting to sexual harassment."

To establish participation in a protected activity under the opposition clause, however, the plaintiff need not show that the conditions he or she opposed "actually amounted to a violation of Title VII." Fantini, 557 F.3d at 32 (internal quotation marks omitted). Instead, the plaintiff must demonstrate only that he or she had "a good faith, reasonable belief that the underlying challenged actions" were unlawful. Id. (internal quotation marks omitted).

Collazo has submitted sufficient evidence to support a jury finding that he had a reasonable, good faith belief that the challenged actions were unlawful. Based on the evidence of Hiraldo's complaints and Collazo's own observations, a jury could find that it was not unreasonable for Collazo to believe that Acevedo's conduct amounted to sexual harassment. Hiraldo complained to Collazo that she felt sexually harassed by Acevedo, noting that he frequently called her, followed her, and criticized her professional work, and that his behavior made her husband feel uncomfortable. In addition, Collazo had observed that Acevedo regularly called Hiraldo, stared at her "all the time," "undress[ed] her with his eyes," and had made a sexually suggestive comment in her presence. This is not a case in which the challenged conduct

harassment."

-17-

amounted to a single, mild incident or offhand comment, such that no reasonable person could have believed that this conduct violated Title VII. See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 270 (2001) (per curiam) (holding that no reasonable person could have believed that plaintiff's exposure to one sexist remark was unlawful sexual harassment); see also Fantini, 557 F.3d at 32 (holding that employee did not have good faith, reasonable belief that another employee's erroneous reporting of certain financial information was an unlawful employment practice under Title VII).

Finally, Bristol-Myers contends that Collazo's conduct was not protected because it was done "in furtherance of his supervisory responsibilities." Bristol-Myers relies on Claudio-Gotay v. Becton Dickinson Caribe, Ltd., in which we stated that, to engage in protected activity under the antiretaliation provision of the Fair Labor Standards Act (FLSA), "the employee must step outside his or her role of representing the company" and take "some action adverse to the company." 375 F.3d 99, 102 (1st Cir. 2004) (internal quotation marks omitted) (holding that an employee whose job duties included documenting hours and wages did not engage in protected conduct under the FLSA by informing his employer of potential overtime violations, because the employee was protecting the company rather than asserting rights adverse to the company); accord McKenzie v. Renberg's Inc., 94 F.3d 1478, 1486 (10th Cir. 1996) (holding that personnel manager whose job duties included "wage and

-18-

hour issues" did not engage in protected conduct under the FLSA by informing company of potential overtime violations).

We assume, without deciding the issue, that similar requirements apply in the Title VII context -- that is, that to engage in protected conduct under Title VII's retaliation provision, an employee must step outside his ordinary employment role of representing the company and take action adverse to the company. Even assuming that these requirements apply, we conclude that Collazo has put forth sufficient evidence to support a jury finding that they were satisfied in this case.[5] Collazo was not a personnel manager warning his company of potential harassment claims against it; instead, he was a Senior Process Scientist assisting a subordinate employee in filing a sexual harassment complaint. By

_____

[5] In light of our conclusion that a reasonable jury could find that Collazo satisfied the additional requirements for protected conduct set forth in the FLSA case law, we need not address the issue of whether the requirements for protected conduct under the antiretaliation provision of the FLSA, as set forth in Claudio-Gotay, also apply to Title VII. However, we note that the language of the antiretaliation provision of the FLSA is different from that of Title VII. Employees engage in protected conduct under Title VII's antiretaliation provision if they "oppose[] any practice made an unlawful employment practice" by the statute. 42 U.S.C. § 2000e-3(a). The FLSA's antiretaliation provision does not contain an equivalent "opposition" clause, but instead makes it unlawful to discharge or otherwise discriminate against an employee "because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee." 29 U.S.C. § 215(a)(3).

supporting Hiraldo in lodging and pursuing her sexual harassment complaint with Human Resources, Collazo "stepp[ed] outside" his normal employment role as a Senior Process Scientist and took "action adverse to the company." See Claudio-Gotay, 375 F.3d at 102. Bristol-Myers asserts that Collazo acted in compliance with the company's equal employment policies and therefore his conduct was "in furtherance of his supervisory responsibilities" and was not protected. However, an employer cannot be permitted to avoid liability for retaliation under Title VII simply by crafting equal employment policies that require its employees to report unlawful employment practices.

### b. Causal Connection

Bristol-Myers also contends that Collazo has failed to establish the third element of his prima facie case, a causal connection between his protected conduct and termination. However, Collazo has produced evidence that he was terminated on February 21, shortly after his efforts to assist Hiraldo in filing and pursuing her sexual harassment complaint on February 10, February 12, and February 20. This showing of temporal proximity is sufficient to establish a prima facie case of causation. See DeCaire v. Mukasey, 530 F.3d 1, 19 (1st Cir. 2008) ("[O]ur law is that temporal proximity alone can suffice to meet the relatively light burden of establishing a prima facie case of retaliation.") (internal quotation marks omitted); see also Mariani-Colon v. Dep't of

<u>Homeland Sec. ex rel. Chertoff</u>, 511 F.3d 216, 224 (1st Cir. 2007) (holding that temporal proximity between June 2002 complaint of discrimination and August 2002 termination was sufficient to make prima facie showing of causation).

### 2. **Pretext**

Bristol-Myers maintains that Collazo's termination resulted from the combination of two legitimate factors: a corporate reorganization that required the elimination of Collazo's position, and perceived deficiencies in Collazo's job performance that made him unqualified to fill a different position in the company. Collazo does not contend that Bristol-Myers failed to articulate a legitimate nonretaliatory reason for his termination. Therefore, we focus on the ultimate issue: whether, viewing the record as a whole and taking all inferences in Collazo's favor, a reasonable jury could find that Bristol-Myers' stated reasons for his termination were a pretext for unlawful retaliation. <u>Potter</u>, 604 F.3d at 39. To withstand summary judgment, a plaintiff need not "prove by a preponderance of the additional evidence that [retaliation] was in fact the motive for the action taken. All a plaintiff has to do is raise a genuine issue of fact as to whether [retaliation] motivated the adverse employment action." <u>Dominguez-Cruz</u> v. <u>Suttle Caribe, Inc.</u>, 202 F.3d 424, 433 (1st Cir. 2000).

We conclude that there was sufficient evidence presented on summary judgment for a reasonable jury to infer that Bristol-

Myers terminated Collazo because of his protected conduct and not for legitimate nonretaliatory reasons. First, the evidence Collazo submitted in support of his prima facie case established particularly close temporal proximity between his protected conduct and his termination. As noted above, he was terminated on February 21, just after he assisted Hiraldo in complaining of sexual harassment to Human Resources on February 10, again on February 12, and a third time on February 20. When an adverse employment action "follows hard on the heels of protected activity, the timing often is strongly suggestive of retaliation." Noviello v. City of Boston, 398 F.3d 76, 86 (1st Cir. 2005).

Second, Collazo presented evidence from which a reasonable jury could conclude that Bristol-Myers' claimed reasons for terminating him -- reorganization and performance -- were pretextual. Bristol-Myers presented evidence that in the weeks before and after Collazo's termination, the company implemented certain administrative changes in the Barceloneta and Humacao plants. On January 21, 2003, López sent an email to his staff, including Collazo, informing them of upcoming "reorganizational initiatives." Several weeks later, on February 11, López sent another email announcing "several administrative changes" that had occurred within the department such as transfers and redistributions of job duties, and noting that more changes were to come including "new hires." After Collazo's termination, Bristol-Myers eliminated

his Senior Process Scientist I position.[6] Around the same time, the company created a new position, Associate Director of Technical Development, which had somewhat different job duties than the Senior Process Scientist I position. For example, the Associate Director supervised a group of laboratory scientists, as Collazo had, but also oversaw the establishment of a new pilot plant in Barceloneta and supervised the personnel hired to work at the pilot plant. In October 2002, several months before Collazo's termination, Bristol-Myers interviewed a prospective candidate, Braulio Santiago, for the Associate Director position. Bristol-Myers offered Santiago the position on February 17, 2003, and he accepted on February 20.

An employer may, of course, exercise its business judgment to eliminate positions as part of a company reorganization or reduction in force, even if the individuals in those positions have engaged in protected activity or are members of protected groups. See Smith v. F.W. Morse & Co., Inc., 76 F.3d 413, 422 (1st Cir. 1996). However, an employer may not use "reorganization" or "layoff" as a convenient excuse for terminating an employee on a discriminatory or retaliatory basis. Id. ("Whether or not trimming the fat from a company's organizational chart is a prudent practice in a particular business environment, the employer's decision to eliminate specific positions must not be tainted by a discriminatory

---

[6] Collazo was the only employee to hold the title of Senior Process Scientist I at the Barceloneta site.

animus."); <u>Weston-Smith</u> v. <u>Cooley Dickinson Hosp., Inc.</u>, 282 F.3d 60, 69 (1st Cir. 2002) ("[A]n employer may not try to shield a discriminatory or retaliatory termination by hiding it in a layoff.").

In this case, Collazo has submitted evidence from which a reasonable jury could conclude that the purported company reorganization was not the real reason for his termination. Collazo does not dispute that he received emails from López in late January and early February announcing upcoming "reorganizational initiatives" and "administrative changes." However, although those messages detailed ongoing organizational changes,[7] none of them mentioned the possibility that Collazo's position would be eliminated. Bristol-Myers has not produced any other documents discussing the planned reorganization; indeed, Human Resources

---

[7] For example, the February 11 email noted that "part of the changes are still to occur (validation, process robustness, new hires, etc., etc.)." The email then detailed the changes that had already occurred:
> 1) Eric Acevedo was transferred to the Humacao process support group. He now reports to Edgar (effective December 31, 2002). . . .
> 2) Norka Gutierrez and Migdalia Velazquez now report to Arturo Hornedo (effective 02-10-03).
> 3) Gladyris Serrano now reports to Arturo Hornedo.
> 4) Carlos Cruz and Sigfredo García report to Edgar.
> 5) Arturo is responsible for all the advanced instrumentation for both Barceloneta and Humacao. . . .
> I'll keep you posted on these and any other events.

Director Vilanova testified that she had not seen any documents discussing the reorganization. Although Collazo occupied a management-level position and reported directly to López, the Director of Technical Services for both the Humacao and Barceloneta plants, Collazo received no advance notice that Bristol-Myers was considering eliminating his position as part of the reorganization. See Dominguez-Cruz, 202 F.3d at 432 (holding that evidence that plaintiff "had no prior notice that the company was considering eliminating the plant manager position," even when plaintiff was involved in the restructuring efforts, supported finding of pretext).

Moreover, of the dozen or more employees affected by the reorganization in Barceloneta and Humacao, Collazo was the only employee who was terminated. No other positions at the Barceloneta or Humacao plants were eliminated as a result of the reorganization. Although Collazo's position of Senior Process Scientist I was eliminated at the Barceloneta plant, the Senior Process Scientist I position at the Humacao plant, which was occupied by an employee with several years less seniority than Collazo, was not affected by the reorganization. In addition, other employees in Collazo's department were transferred to a different job site or given changes in job responsibilities as part of the reorganization, but Collazo was not offered the opportunity to transfer to a different site or position. See Miller v. Fairchild Indus., 885 F.2d 498, 506 (9th

-25-

Cir. 1989) (holding that evidence plaintiffs were laid off, when other employees were given opportunity to transfer, supports finding of pretext).

Bristol-Myers appears to acknowledge that when it implemented the reorganization, it could have transferred Collazo to a different location or position rather than terminating him. However, it contends that management rejected these alternatives because of perceived problems with Collazo's work performance.[8] In particular, Bristol-Myers contends that management determined that deficiencies in Collazo's recent performance made him unqualified to occupy the newly created Associate Director position. López, Collazo's immediate supervisor from April 2002 until his termination, testified that as of late 2002 and early 2003, he perceived problems with Collazo's communication and leadership skills and had discussed his concerns with Vilanova and other supervisors. López further stated that he drafted a performance improvement plan for Collazo in December 2002 and January 2003, but had not yet finalized the plan at the time of Collazo's termination. Bristol-Myers points to a memorandum from López to Collazo with the subject heading "Performance Improvement Plan" (PIP), dated January 13, 2003, which listed a number of areas in which Collazo had not met expectations. The draft PIP stated that Collazo failed to

_____

[8] Vilanova testified that the management-level employees involved in the decision to terminate Collazo were López, López's supervisor, Nallagounder Kuppusamy, and herself.

-26-

clearly define and report his contributions to López, lacked a "teamwork mentality," and had made certain errors in his scientific work.

In response, Collazo points to evidence from which a reasonable jury could find that Bristol-Myers' performance rationale was likewise pretextual. Although Bristol-Myers' Human Resources Policy Manual sets forth a detailed four-step progressive discipline policy, Collazo did not receive any verbal or written warnings in the months leading up to his termination. See Hodgens, 144 F.3d at 169 (noting that "'[d]epartures from the normal procedural sequence'" may be probative of pretext) (quoting Reno v. Bossier Parish Sch. Bd., 520 U.S. 471, 489 (1997)). López admitted that at the time of Collazo's termination, López had not given Collazo any counseling pursuant to the progressive discipline policy and, importantly, had not yet given the PIP to Collazo. López stated in deposition that he did not counsel Collazo under the progressive discipline policy because his performance problems were of such "serious magnitude" that López preferred to wait until he had developed a detailed PIP. However, before López had completed the PIP or otherwise communicated his concerns to Collazo, Collazo was terminated. López further admitted that as of January 13, 2003, the date of the draft PIP, he did not believe that Collazo's performance warranted termination.

-27-

Moreover, Collazo has produced evidence that his job performance at Bristol-Myers was exemplary. His most recent written performance evaluation, dated August 1, 2001,[9] was overwhelmingly positive. Among his strengths, the evaluation noted that "Luis is a 100% company driven associate," "Customer oriented," "Good communication skills (written and verbal)," and "Strong organization skill and team leader." In a section labeled "Possible Next Moves," the document stated: "Associate Director on the [Quality Control], Manufacturing and Development areas." In addition, around 2000-2001, Collazo received several "President's Awards" for outstanding contributions to particular scientific projects, each of which was accompanied by a monetary prize. Finally, on two occasions in 2002, Bristol-Myers' parent company awarded Collazo with stock options, which are given to managerial employees based on their performance.

Bristol-Myers likewise contends that, based on Collazo's past performance, it rejected the possibility of transferring Collazo to a different site rather than terminating him. However, these performance concerns are again unsupported. López testified in deposition that he discussed with other supervisors the possibility of transferring Collazo to Humacao, but this option was rejected because Collazo reportedly had behavior problems when

---

[9] Although Bristol-Myers employees ordinarily receive annual written performance evaluations, Collazo apparently did not receive a written evaluation between August 2001 and his termination in February 2003. Bristol-Myers offers no explanation for this gap.

stationed in Humacao in 1998 or 1999. However, López was not Collazo's supervisor during that period, and Bristol-Myers has not produced any performance evaluations, written warnings, or other evidence indicating that Collazo's performance was inadequate during his time in Humacao. On the contrary, Collazo points to evidence that he received a President's Award for outstanding performance while working in Humacao in 2000.

Viewing the summary judgment record in the light most favorable to Collazo, as we must, we conclude that he has raised a genuine issue of fact as to whether his termination was motivated by retaliatory animus. A jury could reasonably conclude, based on the particularly close temporal connection between Collazo's protected conduct and his termination and the deficiencies in Bristol-Myers' articulated reorganization and performance rationales, that Collazo was terminated because of his protected conduct. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993) ("[T]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.").[10]

---

[10] Collazo also claims that his termination violated Puerto Rico Act 80, P.R. Laws Ann. tit. 29, §§ 185a-m. Act 80 "imposes a monetary penalty on employers who dismiss employees without just cause." Otero-Burgos v. Inter American Univ., 558 F.3d 1, 7 (1st Cir. 2009). The act defines just cause for discharge to include "reorganization changes" and inadequate job performance. P.R. Laws Ann. tit. 29, § 185b. The act also "impos[es] a duty on the

-29-

### 3. Duty to Expedite

We address one final matter.  Collazo contends that by refusing to refer the case to a magistrate judge and failing to otherwise expedite the case, the district court violated 42 U.S.C. § 2000e-5(f)(5), which states that a district judge assigned to a Title VII case has a "duty . . . to assign the case for hearing at the earliest practicable date and to cause the case to be in every way expedited."  Collazo points out that the motion for summary judgment was fully briefed and pending as of August 2006.  In February 2007, the district court denied Collazo's motion to refer the case to a magistrate judge.  However, the court did not rule on Bristol-Myers' motion for summary judgment until March 2009.  In light of our conclusion that the district court erred in granting summary judgment for Bristol-Myers on Collazo's Title VII and related state law claims, we need not address this alternative claim of error.  However, we remind the court upon remand of its duty to cause the case to be "in every way expedited."  42 U.S.C. § 2000e-5(f)(5).

---

employer to make certain kinds of 'good cause' discharges [including reorganization changes] so as to preserve seniority rights." Rodriguez v. Eastern Air Lines, Inc., 816 F.2d 24, 27 (1st Cir. 1987); P.R. Laws Ann. tit. 29, §§ 185c.  In light of our conclusion that there is a genuine issue of fact as to whether Collazo's termination was the result of retaliatory animus, rather than company reorganization and inadequate performance, we likewise reverse the grant of summary judgment on Collazo's Act 80 claim.

## III.

For the foregoing reasons, the judgment is <u>affirmed</u> in part and <u>vacated</u> in part. We <u>affirm</u> the judgment of the district court insofar as it granted summary judgment on Collazo's Act 115 claim, but <u>vacate</u> the judgment insofar as it granted summary judgment on Collazo's Title VII, Act 17, Act 69 and Act 80 claims and <u>remand</u> the case for further proceedings consistent with this opinion. The parties shall bear their own costs on appeal.

<u>So ordered.</u>