FILED
United States Court of Appeals
Tenth Circuit

December 20, 2019

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

DREW MILLER,

     Plaintiff - Appellant,

v.

INSTITUTE FOR DEFENSE
ANALYSES, a Delaware non-profit
corporation,

     Defendant - Appellee.

No. 19-1110
(D.C. No. 1:17-CV-02411-NYW)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **LUCERO**, **O'BRIEN**, and **CARSON**, Circuit Judges.
_____

Drew Miller, pro se, appeals from the district court's order granting summary

judgment in favor of Institute for Defense Analyses ("IDA"). In a detailed and well-

reasoned memorandum opinion and order, the magistrate judge found Miller to have

failed to present adequate evidence to withstand summary judgment.[1] Exercising

---

[*] After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination of
this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1] The parties consented to the magistrate judge conducting all proceedings,
including the entry of a final judgment. *See* 28 U.S.C. § 636(c)(1).

jurisdiction under 28 U.S.C. § 1291, we affirm the court's February 26, 2019 decision and order.

## I. BACKGROUND

### A. The Claims

Miller pled four claims arising from the termination of his employment with IDA: (1) retaliation in violation of the False Claims Act, 31 U.S.C. § 3730(h)(1); (2) retaliation in violation of the Defense Contractor Whistleblower Protection Act, 10 U.S.C. § 2409(a)(1)(A); (3) wrongful termination for lawful off-duty activity in violation of Colo. Rev. Stat. § 24-34-402.5; and (4) unlawful prevention of lawful political participation in violation of Colo. Rev. Stat. § 8-2-108.[2]

### B. Undisputed Material Facts

"IDA is a non-profit corporation organized under a government mandate and operating in the public interest, and it manages three federally funded research and development centers that provide objective analyses of national security issues." R. Vol. II at 188 (internal quotation marks omitted).

Miller, a retired United States Air Force Reserve Colonel, is a graduate of the United States Air Force Academy, and also holds both a master's degree and Ph.D. in public policy. In or around 2003, Miller began working for IDA as a consultant. In 2006, he became an adjunct employee, working on a part-time, hourly basis, with no

---

[2] Miller pled, but did not pursue, claims for non-payment of wages under the Fair Labor Standards Act and unlawful discharge under Colorado law.

benefits.  Then in 2012, he was hired full-time and "began specializing in chem-bio research . . . involv[ing] the research and analysis of biological and chemical threats[.]"  *Id*. (internal quotation marks omitted).  Miller was assigned to work with the Operational Risk Assessment Project ("ORAP").

Jerry Glasow, who worked at the Defense Threat Reduction Agency, was in charge of millions of dollars in funds allocated for the IDA.  Glasow had previously worked for Jeff Grotte, Ph.D., who supervised IDA's chem-bio research, including thirty researchers and the ORAP.[3]  Miller, however, "led the day-to-day execution of the ORAP."  *Id*. at 188-89 (internal quotation marks omitted).  At or about this same time, "Miller [privately] created and began marketing memberships to Fortitude Ranch, a survival community."  *Id*. at 189.

In January 2013, Michael Dominguez, IDA's Division Director, denied Miller's request to write a letter to the editor of the *Wall Street Journal*, identifying himself as an IDA employee and supporting the nomination of then-Senator Chuck Hagel as Secretary of Defense.  In September 2013, another issue arose when Grotte assigned six analysts from another IDA project to the ORAP.  According to Miller, the new analysts were unqualified for their jobs, and "[o]n several occasions, [he] complained to . . . Grotte and others at IDA about the new analysts and the purported ill-effects caused by these analysts to the ORAP; [Miller] even requested that IDA

---

[3] Miller argued an improper relationship existed between Grotte and Glasow because, he suspected, Glasow wanted to return to run the IDA when Grotte retired, and as a result, he speculates, Glasow never questioned Grotte's decisions.

remove him from the ORAP." *Id*. Other employees, however, contradicted Miller's assessment and "opined that Dr. Miller's inconsistencies and lack of direction to the six new analysts was the problem." *Id*. at 190.

In any event, in November 2013, "despite the initial success of the ORAP, Dr. Grotte issued a cease work order on the ORAP without informing Dr. Miller of the reasons." *Id*. (citations omitted). According to Miller, "the six new analysts [were reassigned] to new projects," but he was forced to take leave because he had no work. *Id*. Miller believes Grotte shut down the ORAP as retaliation for his complaints about the new analysts. Miller and Grotte never worked together again.

Miller's performance review concerning his work in 2013, noted his lack of day-to-day leadership at the ORAP. In a memorandum dated April 9, 2014, Miller responded to the review "and largely criticized Dr. Grotte's management . . . while also suggesting that Dr. Grotte's negative comments were retaliation for [his] complaints about the six new analysts." *Id*. Significantly, however, Miller's rebuttal contained no allegations of fraud, but at or about the same time, Miller also "raised concerns with Dr. Grotte's use of government funds." *Id*. at 200 (citations omitted).

Unrelated to his performance review, in an email dated April 24, 2014, "Miller submitted for IDA's peer review process an article that he allegedly researched and prepared on his own time concerning a bioengineered viral pandemic—the article was unlike typical IDA articles and [Miller] intended it for mass publication." *Id*. at 190-91. Miller sought mass publication in order to warn the public of the danger and threat of bioengineered pandemics. The proposed article "received strong

4

criticism from Dominguez and IDA's peer reviewers, including," as one example, "the fear-based tone needed reworking to an analytical approach." *Id*. at 191. Although IDA eventually published the heavily edited article, Miller withdrew it from consideration for mass publication.

In late 2014, "Miller approached IDA about giving a presentation at a conference on the psychological and societal effects of chemical, biological, radiological, and nuclear events." *Id*. Dominguez told Miller he needed to identify a government officer who would clear the presentation for public release. Miller identified the National Guard Bureau, whose project leader asked Miller to draft a report on the topic before presenting. Miller submitted the draft to Dominguez for peer review by Grotte and another IDA employee. The draft received "grave condemnation" from the peer reviewers, "which Dr. Miller believe[d] was retaliation for complaining about the six new analysts assigned to the ORAP." *Id*. at 192.

On or about April 28, 2015, Dominguez raised a potential conflict of interest with Fortitude Ranch and Miller's chem-bio work for IDA. He directed Miller "not to speak or write publically [sic] about any topic that relates to 'chem-bio' pandemics or societal collapse." *Id*. (internal quotation marks omitted). Miller disagreed about the alleged conflict of interest; nonetheless, he agreed not to write or speak on these topics.

The following day, April 29, Grotte levied scientific misconduct charges against Miller in response to the NGB paper. The IDA launched a misconduct investigation in June 2015, which ultimately concluded although Miller had not

5

committed scientific misconduct, the paper was seriously flawed. Among other things, the investigation found the paper "was not written in an objective manner, made misleading statements and used some references in a deceptive way, and failed to meet IDA standards." *Id*. at 192-93 (brackets and internal quotation marks omitted).

For his part, "Miller vehemently disagreed" with the investigation, which he "believed to be additional whistleblower retaliation, and which caused damage to [his] reputation as well as stress and anxiety given the prospects of severe ramifications if found guilty." *Id*. at 192.

As a result of the investigation and the conclusions drawn from it, Miller was returned to his previous status as an adjunct employee, working part-time with no benefits. And in March 2016, Dominguez issued Miller "a letter of counseling . . . admonish[ing] [him] for his violations of IDA practices standards, including his purported work on chem-bio related issues on 'his own time,' and prohibit[ing] [Miller] from working on chem-bio-related projects while employed with IDA or in academic or professional forums outside of IDA." *Id*. at 193 (internal quotation marks omitted).

Despite Dominguez's prohibition, in late 2016, Miller "published an article titled 'The Age of Designer Plagues' in the journal The American Interest," *id*., which was essentially the same article Miller published in 2014. Grotte alerted Dominguez to the "new" article in an email dated January 12, 2017. Believing Miller had violated the prohibition and "pursuant to the decision of IDA's Vice President,

6

General Counsel, and Human Resource Director, [Dominguez] terminated Dr. Miller on or about January 17, 2017." *Id*. at 193-94.

"Following his termination, [Miller] filed a Whistleblower Reprisal Complaint with the [Department of Defense] Office of the Inspector General and a fraud, waste, and abuse complaint with [the Department's agency]." *Id*. at 194 (brackets and internal quotation marks omitted). The record does not establish what, if anything, happened after the filing, but in any event, Miller filed suit on October 6, 2017.

## II.  STANDARD OF REVIEW

We construe Miller's pro se pleadings liberally and hold him "to a less stringent standard than . . . pleadings drafted by lawyers." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). But "[a]t the same time, we do not believe it is the proper function of the . . . court to assume the role of advocate for the pro se litigant." *Id*. The magistrate judge applied this standard to Miller's pro se pleadings throughout the litigation. Nonetheless, Miller argues, without any support, the magistrate judge's "memorandum demonstrated bias in favoring the Denver big law firm attorneys over the Pro Se party, highlighting their material facts and ignoring mine." Aplt. Opening Br. at 32. Miller's discourse on the general topic of pro se litigation in the federal courts has nothing to do with the conduct of the magistrate judge in his case. In fact, Miller admits he "respect[s] Judge Wang's experience as an attorney, applaud[s] her demeanor and kindness, *but suspect[s]* that inherent bias against Pro Se parties impacted her judgment." *Id*. at 33-34 (emphasis added). Miller's suspicions are insufficient to raise an issue on appeal.

7

Under Fed. R. Civ. P. 56(a), "[t]he [district] court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "We review a grant of summary judgment de novo." *Adams v. Am. Guarantee & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000). "A fact is 'material' if under the substantive law it could have an effect on the outcome of the lawsuit." *Id*. "An issue is 'genuine' if a rational juror could find in favor of the nonmoving party on the evidence presented." *Id*. (brackets and internal quotation marks omitted).

"In conducting our review, we view the factual record and draw any reasonable inferences therefrom in the light most favorable to the nonmoving party." *Id*. To avoid summary judgment, the party opposing the motion must come forward with evidence and cannot rely on "mere speculation, conjecture, or surmise. Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006) (citation and internal quotation marks omitted).

"Where . . . a defendant moves for summary judgment to test an affirmative defense, the defendant must demonstrate that no disputed material fact exists regarding the affirmative defense asserted." *Helm v. Kansas*, 656 F.3d 1277, 1284 (10th Cir. 2011) (brackets, ellipsis, and internal quotation marks omitted). "Once the defendant makes this initial showing, the plaintiff must then demonstrate with specificity the existence of a disputed material fact." *Id*. (internal quotations marks omitted).

Throughout his brief, Miller confuses arguments and theories with evidence. But no matter how fervently they are held, his personal opinions, assumptions, or suspicions cannot defeat summary judgment. Nor can Miller meet his burden by arguing the magistrate judge ignored certain facts without showing how those facts are material to his claims, which he has failed to do.

### III.  DISCUSSION

#### A.  <u>False Claims Retaliation</u>

"The [False Claims Act] covers all fraudulent attempts to cause the government to pay out sums of money." *United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1217 (10th Cir. 2008) (internal quotation marks omitted). "Because employees will often be in the best position to report frauds perpetrated by their employers, the statute includes a whistleblower provision to protect employees from retaliation." *Potts v. Ctr. for Excellence in Higher Educ., Inc.*, 908 F.3d 610, 613 (10th Cir. 2018) (internal quotation marks omitted).[4]

Without any direct evidence of retaliation, a plaintiff asserting a False Claims Act retaliation claim may rely on circumstantial evidence under the

---

[4] Section 3730(h)(1) provides: "Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter."

burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).[5]  Although this court has not formally adopted the *McDonnell Douglas* burden-shifting framework as applying to such claims, other courts considering the issue have uniformly applied this framework.[6]  We do likewise.

"Adapting *McDonnell Douglas* to the [False Claim Act's] anti-retaliation provision, a plaintiff first must set forth a prima facie case of retaliation.  Once this is accomplished, the burden then shifts to the defendant to articulate a legitimate, nonretaliatory reason for the adverse employment action."  *Harrington v. Aggregate Indus.-Ne. Region, Inc.*, 668 F.3d 25, 31 (1st Cir. 2012) (citation omitted).  "[I]f the employer produces evidence of a legitimate nonretaliatory reason, the plaintiff must assume the further burden of showing that the proffered reason is a pretext calculated to mask retaliation."  *Id*.  *See also Diaz v. Kaplan Higher Educ., LLC*, 820 F.3d 172, 176 (5th Cir. 2016) (same).

---

[5] Miller continues to insist he provided direct evidence of retaliation and therefore *McDonnell Douglas* does not apply.  But he cites no direct evidence of retaliation in the record and we can find none.

[6]  *See Diaz v. Kaplan Higher Educ., LLC*, 820 F.3d 172, 175 n.3 (5th Cir. 2016); *United States ex rel. Schweizer v. Océ N.V.*, 677 F.3d 1228, 1240-41 (D.C. Cir. 2012); *Harrington v. Aggregate Indus.-Ne. Region, Inc.*, 668 F.3d 25, 31 (1st Cir. 2012); *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 186 (3d Cir. 2001).  And in unpublished decisions, this court and the Sixth Circuit have also applied the *McDonnell Douglas* framework to False Claims Act retaliation claims. *See United States ex rel. Erickson v. Uintah Special Servs. Dist.*, 268 F. App'x 714, 717-18 (10th Cir. 2008); *Scott v. Metro. Health Corp.*, 234 F. App'x 341, 346 (6th Cir. 2007).

A plaintiff proves a prima facie case of False Claims Act retaliation by showing "(1) the employee engaged in protected activity, (2) the employer . . . knew about the protected activity, and (3) retaliation because of his protected activity." *United States ex rel. King v. Solvay Pharm., Inc.*, 871 F.3d 318, 332 (5th Cir. 2017) (brackets, ellipsis and internal quotation marks omitted). With regard to the element of causation, "[t]he [False Claims Act] prohibits adverse employment action taken 'because of' protected activity." *Id.* at 333 (quoting § 3730(h)(1)). At least one circuit has held the heightened "but-for" causation standard applies only at the third and final pretext stage of the *McDonnell Douglas* framework—not at the prima facie stage. *See Garcia v. Prof'l Contract Servs., Inc.*, 938 F.3d 236, 241 (5th Cir. 2019) (a prima facie case of retaliation under the False Claims Act requires a plaintiff only to "demonstrate a 'causal connection' between his protected activity and his firing, even if he must ultimately demonstrate but-for causation at the pretext stage").

We assume, arguendo only, Miller satisfied the first two elements of a prima facie retaliation claim—he engaged in protected activity and IDA knew about the protected activity. Regarding the third element, we again assume without deciding Miller need only establish the lesser requirement of a causal connection—not but-for causation. In this regard, Miller maintained there was a causal connection between his complaints throughout the fall of 2013 about the six researchers assigned to ORAP, and the concerns he raised in April 2014, and possibly as late as November

11

2014, about Grotte's improper spending, and the scientific misconduct investigation and his later termination.[7]

In the absence of direct evidence, to establish causation, Miller "must present evidence of circumstances that justify an inference of retaliatory motive." *Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014) (internal quotation marks omitted). To establish such a motive, courts may infer a causal connection where "protected conduct is closely followed by the adverse action." *Id*. Here, Miller relied on the alleged temporal proximity between his protected conduct and the adverse action is what Miller relied on to prove causation.

But Miller's "protected conduct" lacks the required temporal proximity needed to justify an inference of retaliatory motive. For example, "[w]e have held that a one and one-half month period between a protected activity and adverse action may, by itself, establish causation[, but] a three-month period, standing alone, is insufficient to establish causation." *Foster v. Mountain Coal Co.*, 830 F.3d 1178, 1191 (10th Cir. 2016) (brackets and internal quotation marks omitted); *see also Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1266 (10th Cir. 2009) (concluding "[a]lthough close temporal proximity between the employee's complaint and the adverse employment

---

[7] Miller argued he suffered several adverse employment consequences in addition to the scientific misconduct investigation and his termination. The district court disagreed, however, concluding "the investigation (and its purported effects) and Dr. Miller's termination are the only occurrences constituting adverse employment actions." R. Vol. II at 197. But even if there were other adverse employment actions, it does not matter, because there was no causal connection between the alleged adverse employment actions and his protected activity.

action may be considered in the retaliation inquiry," a five-month gap was insufficient to create a triable issue of material fact as to retaliation (brackets and internal quotation marks omitted)).

Here, Miller's protected activity ended November 2014, at the latest, but the scientific misconduct investigation did not begin until April 2015, and his termination occurred even later. As such, we agree with the district court that "the month's and year's long gaps between the protected activity and the adverse employment actions fail to support an inference of retaliation." R. Vol. II at 201. And because Miller failed to come forward with any other evidence from which to infer a retaliatory motive, his False Claims Act retaliation claim fails for lack of causation.

## B. <u>Whistleblower Retaliation</u>

The Defense Contractor Whistleblower Protection Act prohibits the discharge, demotion, or discrimination against employees as reprisal for reporting, among other things, government fraud, waste or abuse. *See* 10 U.S.C. § 2409(a)(1)(A).[8] Section 2409(c)(6) provides that the legal burdens in 5 U.S.C. § 1221(e) shall be controlling for any judicial determination of whether retaliation occurred. Section 1221(e), in

---

[8] Section 2409(a)(1)(A) prohibits the discharge, demotion, or discrimination against employees "as reprisal for disclosing to a person or body . . . information that the employee reasonably believes is evidence of . . . [g]ross mismanagement of a Department of Defense contract or grant, a gross waste of Department funds, an abuse of authority relating to a Department contract or grant, or a violation of law, rule, or regulation related to a Department contract . . . or grant."

13

turn, requires that an employee show his protected activity was a "contributing factor" in the adverse employment action taken, unless the employer "demonstrates by clear and convincing evidence that it would have taken the same personnel action" notwithstanding the protected activity. *Id.*

To succeed on his whistleblower retaliation claim, Miller must demonstrate "(1) he engaged in protected activity . . ., (2) the [IDA] decision maker knew he engaged in protected activity, and (3) his protected activity was a contributing factor in the adverse employment action taken against him, unless (4) [IDA] shows by clear and convincing evidence that it would have taken the employment action despite [Miller's] protected activity." *Cejka v. Vectrus Sys. Corp.*, 292 F. Supp. 3d 1175, 1192 (D. Colo. 2018).

Again, assuming Miller engaged in protected activity and IDA was aware of his protected activity, he failed to establish the protected activity was a contributing factor in the adverse employment actions. "A contributing factor is any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision." *Feldman v. Law Enf't Assocs. Corp.*, 752 F.3d 339, 348 (4th Cir. 2014) (internal quotation marks omitted).

While temporal proximity is not an exclusive test but can be a threshold, Miller relied on the temporal proximity between his protected activity and the adverse employment actions almost exclusively in attempting to establish causation. Lacking other probative evidence, he failed to demonstrate the degree of temporal proximity from which the district court could reasonably draw an inference of

14

retaliation.  Moreover, Miller failed to present any other evidence on causation.

Therefore, his whistleblower retaliation claim fails.

**C.  Unlawful Termination (Lawful Off-Duty Activity)**

Colo. Rev. Stat. § 24-34-402.5, Colorado's Lawful Activities Statute, considers it a "discriminatory or unfair employment practice" to terminate an employee because he engaged "in any lawful activity off the premises of the employer during nonworking hours."  One exception to protection of the statute exists where conduct "[r]elates to a bona fide occupational requirement or is reasonably and rationally related to the employment activities and responsibilities of a particular employee or a particular group of employees, rather than to all employees of the employer."  "The statute . . . reflects a legislative attempt to balance an employee's right to engage in lawful activity away from work with an employer's legitimate business interests and needs."  *Ruiz v. Hope for Children, Inc.*, 352 P.3d 983, 985-86 (Colo. App. 2013).

At issue is Miller's termination for lawful off-duty conduct—publication of "The Age of Designer Plagues."  In April 2015, Dominguez raised a potential conflict of interest with Fortitude Ranch and Miller's chem-bio work for IDA, and he directed Miller not to speak or write publicly about any topic related to chem-bio pandemics or societal collapse.  Specifically, Dominguez "was concerned because Fortitude Ranch involved subject matter (disaster preparation, global pandemics, etc.) that overlapped with portions of IDA's work in general, and some of Dr. Miller's work at IDA in particular."  R. Vol. I at 531.

15

On summary judgment, IDA argued the restriction on Miller's ability to speak or write about certain topics was related to a bona fide occupational requirement, because its "reputation for impartiality could be seriously damaged by an employee publishing articles warning of an imminent biological pandemic while simultaneously earning personal revenue by selling memberships to a community designed to survive just such a disaster." *Id*. at 525. The district court agreed, and so do we.

The term "bona fide" has been interpreted to mean in "good faith; honestly, openly, and sincerely." *People v. Terry*, 720 P.2d 125, 127 (Colo. 1986) (internal quotation marks omitted). The undisputed evidence shows the IDA to have imposed the restriction in good faith. The district court noted that in his declaration, Dominguez explained he "reported a potential conflict of interest involving Dr. Miller's management/ownership role in Fortitude Ranch. Specifically . . . Dominguez stated [he] was concerned because Fortitude Ranch involved subject matter . . . that overlapped with portions of IDA's work in general, and some of Dr. Miller's work at IDA in particular." R. Vol. II at 207 (internal quotation marks omitted). Moreover, Dominguez "feared that the appearance of the identical statements on both IDA publications and Fortitude Ranch publications could create the perception of a link between the two, which would compromise IDA's reputation for objectivity." *Id*. (internal quotation marks omitted). Ample evidence supports IDA's affirmative defense; it "imposed this prohibition because it believed Dr. Miller

16

lacked objectivity in this area—a pillar of IDA's mission and essential to its business reputation." *Id*. at 209.

In the face of this overwhelming evidence, Miller argues "the publication ban was a ploy to up the pressure on me to quit, and [he] can convince a jury of this." Aplt. Opening Br. at 28. There is no evidence the restriction was a "ploy," and Miller's unsubstantiated theories and suspicions do not create a triable issue.

## D. **Unlawful Prevention of Lawful Political Participation**

Colorado's Political Participation Statute prohibits an employer from "mak[ing], adopt[ing], or enforce[ing] any rule, regulation, or policy forbidding or preventing any of his employees from engaging or participating in politics." § 8-2-108(1). According to Miller, IDA violated the statute in January 2013, when he was prevented from writing a letter to the *Wall Street Journal* in support of Chuck Hagel as Secretary of Defense.

Section 8-2-108(1) does not contain a statute of limitation. Under these circumstances, Miller had two years to file his claim. *See* Colo. Rev. Stat. 13-80-102(1)(i) (providing where no period of limitation is provided, a plaintiff must file suit within two years after the cause of action accrues). Two years from January 2013 passed without any attempt by Miller to timely file a claim; instead, he waited until October 2017 to file suit—several years beyond the statutory deadline. The district court properly granted summary judgment in favor of IDA on this claim.

## IV. CONCLUSION

The judgment of the district court is affirmed. We deny Miller's "request for sanctions" contained in his reply brief. A party seeking sanctions is required to file a separate motion or notice. *Abeyta v. City of Albuquerque*, 664 F.3d 792, 797 (10th Cir. 2011). We grant IDA's motion to seal and to strike the attachment to Miller's opening brief titled "Report on Institute for Defense Analyses Fraud, Illegal Actions, and Abuse of FFRDC Quasi-Government Powers." The attachment was not part of the record below; instead, Miller cobbled it together from confidential and proprietary information produced in discovery.

Due to the nature of IDA's work, the district court entered a protective order during the litigation to prevent the parties from sharing or using materials defined as "proprietary" and "confidential" for any purpose except preparation for trial unless otherwise authorized by the disclosing party or the court. Despite the order, Miller made clear his intention to publicly disseminate the confidential information contained in the attachment. In anticipation of Miller's unauthorized disclosure, and while this appeal was pending, IDA returned to district court and obtained a further order instructing Miller not to violate the terms of the protective order. IDA was prescient, because the attachment to Miller's opening brief contains the information the district court ordered should not be disclosed.

Miller's attachment to his opening brief is ordered sealed. *See AST Sports Sci., Inc. v. CLF Distribution Ltd.*, 514 F.3d 1054, 1057 n.1 (10th Cir. 2008) (granting motion to seal in order to comply with the district court's protective order).

18

Further, Miller's attachment is stricken. *See United States v. Kennedy*, 225 F.3d 1187, 1191 (10th Cir. 2000) (holding this court does not generally consider material outside the district court record unless it is necessary to "'truly disclose what occurred in the district court'") (quoting Fed. R. App. P. 10(e) (brackets omitted)). Further, Miller's response to IDA's motion to seal, which was provisionally sealed, should remain sealed.

In the final paragraph of Miller's response to IDA's motion to strike, he writes: "[I]f the Court agrees with me that IDA has lied about the evidence being proprietary and confidential, and the evidence and arguments not part of the 10th Circuit Court, I formally request Court action to punish and sanction IDA for deliberate lying to the Court." Aplt. Resp. to Mot. to Strike Attach. and Request for Sanctions for IDA Submission of Lies to the Court at 2. We deny Miller's request because he did not file a separate motion for sanctions. *See Abeyta*, 664 F.3d at 797.

Entered for the Court

Terrence L. O'Brien
Circuit Judge

19